**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Paul Terry TOOMEY,
Defendant-Appellant.**

No. 84–5134.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 5, 1985.

Decided June 26, 1985.

Reinhardt, Circuit Judge, dissented and filed an opinion.

Roger W. Haines, Jr., Asst. U.S. Atty., argued, Peter K. Nunez, U.S. Atty., Roger W. Haines, Jr., Asst. U.S. Atty., on the brief, San Diego, Cal., for plaintiff-appellee.

Bruce Ian Feldman, San Diego, Cal., for defendant-appellant.

Before GOODWIN, WALLACE and REINHARDT, Circuit Judges.

GOODWIN, Circuit Judge.

Toomey appeals from his conviction of one count of conspiracy to import heroin, *see* 21 U.S.C. §§ 952, 960 and 963, of traveling in interstate and foreign commerce in aid of racketeering, *see* 18 U.S.C. § 1952(a)(3), and of unlawful use of a communication facility, a telephone, *see* 21 U.S.C. § 843(b). Toomey claims that the district court erred in denying his motions for judgment of acquittal based on insufficiency of the evidence, abused its discretion in denying his motion for mistrial based upon prosecutorial misconduct, and abused its discretion in rejecting his supplemental voir dire questions. We affirm the judgment.

The evidence consisted primarily of the testimony of four government witnesses, and defendant Toomey. The evidence centered on each witness' version of various meetings and telephone conversations in which they participated.

Special Agents Hill, Counts and Young of the Drug Enforcement Agency, and In-

vestigator Chen of the Hong Kong Custom and Excise Service testified for the government. Their testimony tended to show an agreement between the agents, Ajid Mohaw Balse[1] and Toomey, to buy and sell, for $750,000, 100 kilos of heroin base to be converted into heroin and distributed in the United States.

Agent Hill testified that on March 17, 1983, Agent Counts was introduced to Toomey as the person who would receive the narcotics in San Pedro Harbor and distribute them in the United States. Inspector Chen was introduced as the Hong Kong connection who would smuggle the final product into the United States. At this meeting, Toomey suggested that he travel to Hong Kong to facilitate the payment from the agents and then wire it to Balse in India. Toomey also suggested that they start out with a small to medium amount of narcotics to put Balse's connections in India at ease.

Toomey was present on March 27 when Agent Hill and Balse met and discussed the contemplated transaction. Toomey asked about their profits. Hill told Balse and Toomey that their profits would be approximately $150,000 per kilo, after the drugs were sold in the United States.

On April 8, Toomey called Hill and relayed a telephone message from Balse in India that what they wanted was "on the top of the list." The evidence showed that this was a reference to heroin base. Toomey met Hill that day and gave him Balse's telephone number in Bombay.

Agent Counts met with Toomey on April 13 and told him that the first shipment of two kilograms of heroin base was being diverted to Frankfurt, West Germany. They agreed that payment for the 2 kilos, $15,000, would be made in San Diego, rather than Hong Kong because of the small amount. Agent Counts handed Toomey the $15,000 on May 3.

Toomey traveled with Balse to Hong Kong on May 9. Balse went on to India.

Toomey stayed in Hong Kong to research local investment and banking procedures and law, and to receive payment for the narcotics once they arrived in Hong Kong and thereafter wire funds to Balse in India. While in Hong Kong, Toomey conducted his research and contacted various individuals regarding banking and financial transactions in Hong Kong. He discussed these efforts with Inspector Chen and Agent Young. He left Hong Kong without receiving any payments; Balse was arrested in India before further narcotics were shipped.

Toomey testified in his own defense that although he knew that the transactions contemplated by Balse and the others involved narcotics, he did not know and never agreed that the narcotics would end up in the United States. He denied that the agents ever said the narcotics were to be delivered to the United States, and maintained that he was to act solely as a financial advisor who would investigate foreign banking and tax laws and ways to legitimately invest in the United States the funds obtained abroad. Toomey testified that on several occasions he expressed concern to the agents about the narcotics deal, and voiced his desire that everything be done offshore and no United States laws be violated.

■ At the conclusion of the government's case-in-chief, Toomey moved for judgment of acquittal as to all three counts. This motion was denied. His renewed motion at the conclusion of all the evidence was also denied. In reviewing the district court's denial of Toomey's motions, we must decide whether, viewing the evidence in the light most favorable to the government, there was sufficient evidence from which the jury could rationally conclude beyond a reasonable doubt that Toomey was guilty of each count charged. *United States v. Oropeza,* 564 F.2d 316, 321 (9th Cir.1977), *cert. denied,* 434 U.S.

---

**1.** Ajid Mohaw Balse, an Indian National, was indicted with Toomey but not prosecuted. He was arrested by Indian authorities while in India in connection with the charged conspiracy. Apparently Balse is still in India.

1080, 98 S.Ct. 1276, 55 L.Ed.2d 788 (1978); *United States v. Kaplan*, 554 F.2d 958, 963 (9th Cir.), *cert. denied*, 434 U.S. 956, 98 S.Ct. 483, 54 L.Ed.2d 315 (1977). Applying that standard, we agree with the district court that the government's evidence was more than sufficient to permit the jury to infer the existence of the conspiracy as charged and Toomey's participation in it, that Toomey's intent in traveling to Hong Kong was to carry out his part of the agreement, and that the relaying of messages via the telephone was in furtherance of the conspiracy.

▮ Toomey's testimony to the contrary merely created evidentiary conflicts which the district court properly left for resolution by the jury. Given the context of the conversations in which Toomey's concerns were raised, it is quite possible that the jury concluded that his concerns were addressed to the payment and receipt of funds abroad so as to avoid receipt of payment for the narcotics in the United States. This interpretation is not unreasonable and is consistent with Toomey's role as a financial advisor who agreed to investigate and set up bank accounts or financial and investment ventures from which the profits from the narcotics venture could be legitimately channeled and invested in the United States. It is the jury's duty to weigh the evidence and determine what version of the facts to believe. *United States v. Young*, 573 F.2d 1137, 1139 (9th Cir.1978); *Kaplan*, 554 F.2d at 964.

Toomey's claim of prosecutorial misconduct is based on the following statement made by the prosecutor during his closing argument: "We know that the delivery of heroin base in [Frankfurt,] West Germany occurred on April 28." Defense counsel objected because there had "been no evidence that the product was ever identified by anyone—there was no evidence put on as to what it is," and the prosecutor's statement was "inflammatory." He then moved for a mistrial based upon prosecutorial misconduct. The trial judge denied the motion noting that there was circumstantial evidence in the case about a package

delivered to Frankfurt, but no direct evidence. The prosecutor then moved to reopen his direct to "bring in the Germans." The trial judge denied this motion, and told the prosecutor "you can correct that statement...." The prosecutor never corrected his statement and did not refer to the package or delivery to Frankfurt in the remainder of his remarks. The trial judge did not give a cautionary instruction as to the prosecutor's statement but did instruct the jury twice that statements and argument of counsel are not evidence.

▮ In reviewing the district court's denial of Toomey's motion for mistrial, we first determine whether the prosecutor's statement constituted error. If it did, we will affirm unless it is more probable than not that the error materially affected the verdict. *United States v. West*, 680 F.2d 652, 656–57 (9th Cir.1982); *United States v. Valle-Valdez*, 554 F.2d 911, 916 (9th Cir.1977).

▮ It is true that no physical evidence of heroin nor of any narcotics was admitted into evidence. However, a review of the record indicates that there was circumstantial evidence sufficient to allow the jury to infer that a package containing heroin base was shipped to Frankfurt. Therefore, although the prosecutor could have used more accurate terms, his statement was not necessarily error.

▮ Even if the prosecutor's statement is characterized as stating facts not in evidence, the error was harmless in this case. Whether or not heroin base was delivered to Frankfurt or any other place is immaterial to the charges against Toomey. The charges concerned an agreement to import heroin, not the actual importation nor possession. The diversion of the shipment of the two kilos of the heroin base from Hong Kong to Frankfurt is not inconsistent with the government's view of the agreement and does not necessarily indicate that the substantive goal of the conspiracy was altered. According to the agreement, the heroin base would be refined before being delivered to the United

States. Frankfurt had been discussed by the parties as one of the international locations, in addition to Hong Kong, where the heroin precursors could be refined into heroin. Moreover, given the innumerable references to heroin, heroin base and other controlled substances throughout the trial, it is highly unlikely that the prosecutor's statement materially affected the jury's verdict.

■ Although we conclude that the district court did not abuse its discretion in rejecting Toomey's supplemental voir dire questions, the point warrants discussion. The district court has considerable discretion in determining the manner and scope of voir dire. *Rosales-Lopez v. United States*, 451 U.S. 182, 189, 101 S.Ct. 1629, 1634, 68 L.Ed.2d 22 (1981). Under Rule 24(a) of the Federal Rules of Criminal Procedure, the court may conduct the examination itself or allow the attorneys to do so. If the trial judge chooses to conduct the voir dire examination, the judge must exercise sound judicial discretion in accepting or rejecting supplemental questions proposed by counsel. "Sound judicial discretion" means "that the trial judge should keep uppermost in ... mind" the right of the parties "to some surface information about prospective jurors which might furnish the basis for an informed exercise of peremptory challenges or motions to strike for cause based upon a lack of impartiality." *United States v. Baldwin*, 607 F.2d 1295, 1297 (9th Cir.1979). While it is an abuse of discretion to fail to ask questions reasonably sufficient to test jurors for bias or partiality, *Baldwin*, 607 F.2d at 1297; *United States v. Giese*, 597 F.2d 1170, 118 (9th Cir.), *cert. denied*, 444 U.S. 979, 100 S.Ct. 480, 62 L.Ed.2d 405 (1979), the trial court may refuse questions which are "tied to prejudice only speculatively." *United States v. Jones*, 722 F.2d 528, 529 (9th Cir.1983).

In *Jones*, we recognized that there are three instances in which there is a real possibility of prejudice and a consequent need for specific voir dire questioning: (1) When the case carries racial overtones ...; (2) when the case 'involves other matters concerning which either the local community or the population at large is commonly known to harbor strong feelings that may stop short of presumptive bias in law yet significantly skew deliberations in fact' ...; or (3) when the case involves other forms of bias and distorting influence which have become evident through experience with juries.... 722 F.2d at 529–30 (*citing United States v. Robinson*, 475 F.2d 376, 381–382 (D.C.Cir.1973)). Where the topic sought to be explored does not relate to one of these classes, the party requesting specific voir dire questions bears the burden of showing that each question " 'is reasonably calculated to discover an actual and likely source of prejudice, rather than pursue a speculative will-o-the-wisp.' " *Id.* at 530 (quoting *Robinson*, 475 F.2d at 381).

■ Toomey proposed several supplemental questions to test the jurors' attitudes and potential prejudices about heroin, its precursors, and narcotics generally. There is no doubt that when narcotics are the subject of the offense being tried, both the defense and prosecution are entitled to some probing of juror bias as to narcotics specifically. But, while Toomey's questions might have been asked, nothing in the record indicates that the judge's failure to honor Toomey's requests amounted to an abuse of discretion.

The district judge informed the prospective jurors twice, both at the beginning and the end of voir dire, of the charges against Toomey. The judge's initial comments prompted the immediate response of one prospective juror who said that it would be difficult for her to be fair in the case. This juror was excused. The judge asked the jurors collectively and individually whether they knew or had any reason to believe that it would be difficult for them to be fair and impartial knowing the charges against Toomey. Two jurors were excused after acknowledging that they were pro-law enforcement. One woman noted that her son had recently been charged with a criminal

offense; another stated she was once charged with possession of marijuana. One man indicated that he had been a victim of several burglaries. There is no indication in the record that the prospective jurors were anything but candid. The trial judge observed the demeanor and responses of the prospective jurors and was in the best position to evaluate their impartiality and candor. *See United States v. Perry,* 550 F.2d 524, 528 (9th Cir.), *cert. denied,* 434 U.S. 827, 98 S.Ct. 104, 54 L.Ed.2d 85 (1977).

In light of Toomey's expected defense that although he knew the transactions contemplated by Balse and the agents involved narcotics, he did not know or agree that they would be imported into the United States, he proposed supplemental question 49. According to Toomey, question 49 was designed to distinguish between international operations and an operation to import into the United States:

> It is the belief of the defense that the evidence will tend to show that Defendant PAUL T. TOOMEY may have agreed to become involved in international monetary transactions, stemming, at least in part, from international drug sale funds and other sources of cash, belonging to others and unrelated to the defendants. Would this fact alone so influence your evaluation of the case that you would be unable to objectively consider the critical issues of whether PAUL T. TOOMEY agreed that the drugs would be brought to the United States and that he knew the drugs would be brought to the United States?

The district court did not abuse its discretion in failing to ask this question. The question is argumentative; there is no requirement that the court propound argumentative questions on voir dire. *United States v. Hopkinson,* 631 F.2d 665, 667 (10th Cir.1980), *cert. denied,* 450 U.S. 969, 101 S.Ct. 1489, 67 L.Ed.2d 620 (1981). While it is true that a defendant is entitled to a voir dire that fairly and adequately probes a juror's qualifications, a defendant is not necessarily entitled to test the jurors

on their capacity to accept his theory of the case.

It is obvious from a review of the entire voir dire that the district judge was well aware of Toomey's expected defense. Although the judge did not ask Toomey's questions in the precise form requested, she did question the jurors as to topics relevant to Toomey's defense. *Cf. United States v. Conroy,* 589 F.2d 1258 (5th Cir.), *cert. denied,* 444 U.S. 831, 100 S.Ct. 60, 62 L.Ed.2d 40 (1979). Specifically, the judge stated that evidence of Toomey's ability to invest funds abroad was likely to be introduced during trial. She explained that foreign investment is not unlawful per se and in many situations can be legal. She then collectively asked the jurors whether they would have any difficulty objectively evaluating evidence about investments generally and foreign investments in particular. The judge also noted that there would be evidence of foreign travel. These questions were preceded and followed by a reading of the charges against Toomey and repeated questioning as to whether the jurors knew or had any reason to believe that it would be difficult for them to be fair and impartial. We find no abuse of discretion in this procedure. *See United States v. Tegzes,* 715 F.2d 505, 508–09 (11th Cir.1983); *United States v. Rojas,* 537 F.2d 216, 219 (5th Cir.1976), *cert. denied,* 429 U.S. 1061, 97 S.Ct. 785, 50 L.Ed.2d 777 (1977); *United States v. Peterson,* 483 F.2d 1222, 1227–28 (D.C.Cir.), *cert. denied,* 414 U.S. 1007, 94 S.Ct. 367, 38 L.Ed.2d 244 (1973); *United States v. Mattin,* 419 F.2d 1086, 1088 (8th Cir.1970).

The judgment is affirmed.

REINHARDT, Circuit Judge, dissenting:

The threshold issue presented by this case is whether the district court met its obligation to impanel an impartial jury. Notwithstanding the district court's broad inquiry into the backgrounds of the prospective jurors, under the circumstances of this case its questioning did not sufficiently test prospective jurors for bias or partiali-

684

ty. *See United States v. Jones*, 722 F.2d 528, 529 (9th Cir.1983).

The indictment on which Toomey was tried charged him with conspiring to import heroin, traveling in interstate and foreign commerce to facilitate the conspiracy and unlawfully using a communications facility. As the majority has pointed out, Toomey's defense to the conspiracy charge was expected to be that "although he knew the transactions [at issue] involved narcotics, he did not know or agree that they would be imported into the United States...." Maj. Op. at 683. It was therefore apparent prior to trial that Toomey would admit to having participated in narcotics transactions abroad. In order to determine whether Toomey's admitted participation in drug-related activity would create problems of bias or impartiality in prospective jurors, appellant's counsel drafted and submitted question 49. The district court declined to ask the question, however, concluding that it was not necessary in light of other more general questions that it had posed to prospective jurors.

In concluding that the district court's decision not to ask the question did not constitute an abuse of discretion, the majority misconceives the nature and intent of appellant's proposed inquiry. The majority reasons that since the district court inquired into the jurors' abilities objectively to evaluate evidence relating to investments generally, and foreign investments in particular, it did not err with respect to question 49. However, it is clear that question 49 was not directed toward identifying jurors who were biased against parties who engage in foreign investment. Rather, question 49 was intended to identify those jurors who would be unable to remain objective upon learning that the defendant was an admitted narcotics trafficker. Thus, the majority's reliance on the district court's inquiry into the area of foreign investment is, in my view, wholly misplaced.

In *United States v. Jones, supra*, we observed that there are "three instances in which there is a real possibility of prejudice

and a consequent need for specific voir dire questioning." 722 F.2d at 529. One of these involves cases concerning matters about which "either the local community or the population at large is commonly known to harbor strong feelings that may stop short of presumptive bias in law yet significantly skew deliberations in fact...." *Id.* at 529–30. We further concluded that when the matter sought to be explored on voir dire does not fall within one of the three recognized classes, then the party seeking to propound the inquiry must show that it is reasonably calculated to discover an actual and likely source of prejudice. *Id.* at 530.

There can be little question that narcotics trafficking is a topic about which prospective jurors may have feelings sufficiently strong to skew deliberations. Therefore, Toomey's expected defense, that he was involved in the financing of international narcotics trafficking but did not expect the drugs to be imported into the United States, clearly falls into a category that gives rise to "a real possibility of prejudice and a consequent need for special voir dire questioning." *Id.* at 529. However, even if appellant's proposed inquiry did not fall within such a recognized category, it is readily apparent from the question itself that it was reasonably calculated to discover an actual and likely source of prejudice.

That the district court inquired generally into the prospective jurors' attitudes with respect to the *topic* of narcotics does not, in my view, cure the threat of prejudice posed by the district court's failure to ask question 49. Whether the prospective jurors were biased against admitted narcotics traffickers involves an inquiry that is significantly different from an inquiry into whether the fact that the trial involves narcotics would prevent a juror from acting impartially toward an accused. It is entirely possible that one whose feelings about narcotics are not sufficiently strong to render him biased against any person charged with a narcotics offense may nevertheless harbor feelings about admitted narcotics

traffickers that rise to a level of actual bias.[1]

The Fifth Circuit addressed this precise issue in *United States v. Conroy*, 589 F.2d 1258 (5th Cir.1979). As here, defendant had been charged with conspiring to import narcotics. His principal defense, like Toomey's, was to consist of a showing that although he had been involved in the procurement of narcotics abroad, he had neither known that the narcotics were destined for the United States nor intended such. In preparation for the district court's *voir dire*, defendant submitted a question that was intended to determine whether his admitted participation in a narcotics transaction would give rise to juror prejudice.[2] The district judge declined to ask the question.

In concluding that the district judge's failure to ask the question did not constitute an abuse of discretion, the *Conroy* majority did not take the view that the court need not ask questions of the type proposed by the defendant. To the contrary, the majority reasoned only that the question, as it was phrased, would not have elicited the information that the defendant appeared to be seeking. The majority concluded that an affirmative response to the question would not necessarily have meant that the defendant's admitted role in procuring the contraband would so influence a juror that an objective consideration could not be made of the critical question whether the defendant knew that the contraband was destined for the United States. Similarly, inasmuch as the defendant's role in procuring the contraband was relevant to the crimes charged, the majority concluded that a negative response would not have been consistent with each juror's obligation to decide the case on the evidence and instructions. Thus, the majority expressed the view that as the question was phrased, it could not uncover sources of juror prejudice.

Here, I do not read question 49 as ambiguously as the majority read the proposed question in *Conroy*. It is clear from the text of question 49 that Toomey's counsel sought to specifically determine whether Toomey's admitted involvement in foreign narcotics transactions "would so influence the jurors' evaluation of the case that they would be unable to consider the critical issues of whether [he] agreed that the drugs would be brought to the United States and that he knew that the drugs would be brought to the United States." *See* Maj. Op. at 683. Thus, the error in the *Conroy* question, if one existed, was corrected here. Moreover, the importance of the type of distinct inquiry made by Toomey was emphasized by Judge Rubin in his dissent in *Conroy*. In disagreeing with the majority's conclusion that the question requested by the defendant would not have been useful, Judge Rubin recognized that the prospect of juror bias against an admitted narcotic's trafficker was significant:

1. Nor am I persuaded that the district court's questioning in the general area of narcotics can be read to embrace the issue of narcotics traffickers. The voir dire did not, in my view, prompt the jurors to consider their attitudes about admitted narcotics traffickers in addition to their attitudes about narcotics. *Compare United States v. Allsup*, 566 F.2d 68, 70 (9th Cir.1977) (where defendant-appellant had a right to have prospective jurors questioned about their attitudes concerning the insanity defense, district court's vague and incomplete references to evidence of insanity and lack of mental capacity did not convey to jurors that they were to examine their attitudes about the insanity defense) *with United States v. Carabbia*, 381 F.2d 133, 137 (6th Cir.1967) (in prosecution of defendant, who was legitimately involved in wagering, for filing false Treasury Department form, district court's failure to specifically in-

quire into jurors' attitudes towards wagering not error where judge's reading of the indictment was sufficient to inform jurors that defendant was engaged in wagering and jurors stated that they felt no prejudice). Although it was clear from the voir dire that the case would involve narcotics, the voir dire is devoid of any reference to Toomey's status as an admitted narcotics trafficker. Accordingly, there was no reason for the jurors to determine whether their attitudes towards admitted narcotics traffickers rose to the level of actual bias.

2. The question read as follows:

Would the fact that [the defendant] was involved in procuring the marijuana prejudice you in any manner against [the defendant]? 589 F.2d at 1272.

Under these circumstances, it was critical for defense counsel to know whether [the defendant's] admitted complicity in a plot to ship marijuana (which he claimed was directed at Canada rather than the United States) would prejudice any potential juror against him. The substance of the proposed question was calculated to elicit from potential jurors a clue as to whether they harbored any predispositon to convict [the defendant] merely because he was engaged in international marijuana dealing rather than because he was guilty of the precise crimes charged.

*Id.* at 1274.

Finally, Judge Rubin noted the overwhelming authority supporting the rule that "the trial judge may not refuse to charge a jury because the request is phrased inartfully.... If the substance of the request is clear, it is his obligation to give a correct charge." *Id.* at 1275. To the extent that the majority relies on any purported imperfection in Toomey's question, the authority Judge Rubin cites is dispositive.

In light of the high probability of juror prejudice against an admitted narcotics trafficker, and in light of the clear distinction between an inquiry into juror attitudes concerning narcotics generally and toward admitted narcotics traffickers in particular, I conclude that the district court's decision not to inquire into the subject covered by question 49 constituted an abuse of discretion. Under the circumstances of this case, the error was prejudicial. Accordingly, I would reverse Toomey's conviction and remand the matter for retrial.