UNITED STATES of America, Appellee,

v.

David KAPLAN, Appellant.

UNITED STATES of America, Appellee,

v.

David GORWITZ, Appellant.

UNITED STATES of America, Appellee,

v.

Richard DOLWIG, Appellant.

UNITED STATES of America, Appellee,

v.

Earl VOGT, Appellant.

UNITED STATES of America, Appellee,

v.

Walter STRADLEY, Appellant.

UNITED STATES of America, Appellee,

v.

Douglas CASSIDY, Appellant.

Nos. 76–1319, 76–1318, 75–3418, 75–3423, 75–3428 and 75–3337.

United States Court of Appeals, Ninth Circuit.

May 26, 1977.

As Amended on Denial of Rehearing and Rehearing En Banc Sept. 6, 1977.

Michael H. Weiss, San Francisco, Cal., argued, for appellant Cassidy.

Joseph C. Morehead, San Francisco, Cal., argued, for appellant Stradley.

Matthew Segall, Segall & Bitkower, Hollywood, Cal., appeared, for appellant Gorwitz.

Godfrey Isaac, Beverly Hills, Cal., argued, for appellant Dolwig.

George T. Davis, Joseph C. Morehead, San Francisco, Cal., argued, for appellant Vogt.

James L. Browning, Jr., U. S. Atty., Edmund D. Lyons, Jr., Special Atty., U. S. Dept. of Justice, San Francisco, Cal., argued, for appellee.

Before GOODWIN and SNEED, Circuit Judges, and FITZGERALD,* District Judge.

PER CURIAM: **

Seven defendants were indicted upon multiple charges of mail fraud and wire fraud, together with conspiracy, in connec-

---

* The Honorable James M. Fitzgerald, United States District Judge for the District of Alaska, sitting by designation.

** Because of the number and complexity of the issues, all members of the panel participated in the writing of this opinion.

tion with a fraudulent scheme to obtain advance fees for promised loans (letters of credit) which were never delivered. The six appellants whose combined appeals are now before us present a wide variety of challenges to their convictions.

## I. FACTS

During the last part of 1974, a high demand for venture capital to develop real estate stimulated efforts to find money outside of traditional banking channels. All the methods, both legitimate and illegitimate, traded upon the willingness of developers to pay a premium for venture capital. David Kaplan and David Gorwitz, two of the appellants, were early organizers of a corporate entity known as Eurovest, chartered in the Cayman Islands, British West Indies. Eurovest, through one or more of the defendants, located individuals who were seeking to borrow large sums of money, and promised to arrange letters of credit. The victims were told that the letters of credit could be pledged to obtain capital for their projects.

In return for the promised financing, Eurovest would request ownership of some percentage of the venture. Most important, Eurovest required the victims to pay an "advance fee" to cover the alleged expenses of securing the letters of credit. More than $150,000 in advance fees were paid to Eurovest, but no letters of credit were ever issued nor were the advance fees returned.

Viewed in a light most favorable to the government, the evidence produced at trial showed that each of the appellants played a role in the scheme.

Appellant Vogt was a management consultant from New York. He testified that the major service he offers his clients is aid in locating financing for business ventures. Vogt was the initial contact between Eurovest and eight of the thirteen businessmen who negotiated with Eurovest. Each of the eight men Vogt contacted subsequently dealt with appellant Stradley, who was the acting attorney for Eurovest.

Vogt represented to the victims that Eurovest was backed by a prestigious and wealthy Florida family (the Duvals), and that Eurovest had millions of dollars in securities which could be pledged to secure letters of credit.

Appellant Dolwig was prominent in state politics. He was made the trustee of the "escrow" account into which the advance fees were paid. As a California state senator, his connection with Eurovest was supposed to lend credibility and prestige to the enterprise. On occasion, Senator Dolwig reassured victims as to the substantiality of the principals behind Eurovest. His main function in the scheme was to receive advance fees, hold them in his trust account, and turn them over to Eurovest upon written instructions from the corporation.

Appellant Cassidy, an insurance agent, sent insurance binders to some of the victims. These binders purported to protect any advance fees paid by the victims in the event that the promised letters of credit were not forthcoming. From time to time, Cassidy was called upon to vouch for the reliability of the Eurovest enterprise.

The mastermind of the scheme apparently was David Kaplan. It was Kaplan who approved the "loans" to various victims, engaged Senator Dolwig to become the west coast "escrow", convinced the Duval family to lend its name to Eurovest by furnishing the sole director and trustee of the corporation. Kaplan also personally negotiated with most of the victims.

Appellant Gorwitz worked with Kaplan. Gorwitz was the international money courier. Most of the fees from the victims were paid into Dolwig's account and then were turned over to Gorwitz. It was Gorwitz who was to deliver the letters of credit to the victims.

Much of the government's proof centered around the experience of one Paul Heck. Heck paid $60,000 in advance fees to Eurovest. When Eurovest failed to deliver its promised letter of credit, Heck began to pursue the Eurovest principals around the country. He made representations to Kaplan, Dolwig, Vogt, and Stradley that the

entire Eurovest operation was fraudulent. Heck also warned Arthur Lachman, a broker who was dealing with Eurovest on behalf of a client named Conrad Preiss. Lachman, in turn, warned Vogt and Stradley. This evidence became important when some of the defendants insisted that their representations to the victims of Eurovest had been made in good faith.

## II. SUFFICIENCY OF THE EVIDENCE

### A. *Conspiracy Counts*

All the appellants challenge the trial court's denial of the motions for acquittal under Fed.R.Crim.P. 29 and for a new trial, on the grounds that the evidence was insufficient to convict them.

■ As a practical matter, the trial court in deciding a motion for acquittal in a criminal case and the court reviewing that decision on appeal use the same test. *United States v. Leal*, 509 F.2d 122 (9th Cir. 1975); *United States v. Nelson*, 419 F.2d 1237, 1241 (9th Cir. 1969). That is, viewing the evidence in a light most favorable to the government as prevailing party, is the court satisfied that the jurors reasonably could decide that they would not hesitate to act in their own serious affairs upon factual assumptions as probable as the conclusions that the defendant is guilty as charged? *United States v. Nelson, supra.*

With that test in mind, we turn to appellants' arguments:

### 1. *Dolwig.*

■ The government's proof at trial showed that, among other things, Dolwig performed the following acts in relation to the Eurovest scheme: As trustee of the account into which the advance fees were deposited, he participated in setting up a fictitious "escrow". There was no escrow, and Dolwig knew it. The account was simply a conduit to move money from the victims to Gorwitz. Dolwig reassured Paul Heck as to the substantiality of the Eurovest principals; he failed to inform other Eurovest "clients" after he knew of problems Paul Heck was having in securing his letter of credit; he appeared with appellant Kaplan in a hotel different from the one in which Kaplan had told Heck he would be, and Dolwig's wife aided Kaplan in eluding Heck.

Dolwig does not question the factual accuracy of the government's proof, but contends that it fails to establish the requisite intent on his part to join or participate in the conspiracy. Dolwig claims that he himself was a victim who was duped into lending his good name to the Eurovest enterprise. This was a question for the jury. Although the evidence against Dolwig is entirely circumstantial, it does not have to exclude every hypothesis but that of guilt. *United States v. Nelson, supra.* Once the existence of a conspiracy is shown, only slight evidence is needed to connect a defendant with it. *United States v. Marotta*, 518 F.2d 681, 684 (9th Cir. 1975); *Fox v. United States*, 381 F.2d 125, 129 (9th Cir. 1967).

The jury could infer from the evidence that Dolwig knowingly participated in the conspiracy. It was proved that he did nothing to stop the fraud or warn others after Heck had told him that the scheme probably was a total fraud. " * * * [A] conspirator's intent to defraud may be inferred from the fact that he personally knew that the venture was operating deceitfully * * *." *Phillips v. United States*, 356 F.2d 297, 303 (9th Cir. 1965), *cert. denied*, 384 U.S. 952, 86 S.Ct. 1573, 16 L.Ed.2d 548 (1966). As we hold that the jury's decision had support in the evidence, we must affirm Dolwig's conviction of conspiracy in this case.

### 2. *Vogt and Stradley.*

Both Vogt and Stradley admit that they engaged in various business transactions on behalf of Eurovest. However, they claim that they were duped into believing that Eurovest was a legitimate operation. Vogt testified that, but for a lack of funds, he would have invested his own money in Eurovest letters of credit.

The government contends that Vogt and Stradley intended to defraud, and that such

intent was shown by their conduct after receiving warnings from both Heck and Lachman that the scheme was a fraud. That is, Vogt and Stradley continued to negotiate deals with other Eurovest victims without any mention of Heck's and Lachman's warnings and accusations.

■ Credibility was for the jury. The jury had to resolve evidentiary conflicts and draw reasonable inferences therefrom. *United States v. Nelson, supra; United States v. Barham,* 466 F.2d 1138, 1140 (9th Cir. 1972), *cert. denied,* 410 U.S. 926, 93 S.Ct. 1356, 35 L.Ed.2d 587 (1973). An inference of criminal intent can be drawn from circumstantial evidence. *United States v. Childs,* 457 F.2d 173 (9th Cir. 1972); *United States v. Oswald,* 441 F.2d 44 (9th Cir. 1971).

We agree with the trial judge that the jury could reasonably have inferred from the evidence that Vogt and Stradley possessed the intent to participate in the conspiracy.

### 3. *Kaplan and Gorwitz.*

■ By reference to the briefs of the other appellants, Gorwitz and Kaplan challenge the sufficiency of the evidence which led to their conspiracy conviction. It cannot, however, be seriously contended that the evidence as to these two appellants is insufficient.

There was ample testimony, which the jury reasonably could believe, showing that Kaplan was deeply involved in most of the fraudulent Eurovest transactions. Gorwitz and Kaplan continually engaged in reassuring victims as to the legitimacy of their operation.

Gorwitz was named as courier of the non-existent letters of credit. Additionally, he took possession of at least part of the advance funds which had been deposited in the Dolwig "escrow" account. These funds eventually found their way into a joint bank account in the Bahamas which belonged to Kaplan and Gorwitz.

At trial, Kaplan, testifying in his own behalf, attempted to place the culpability for this enterprise upon unindicted coconspirator Duval. The government provided testimony to the contrary which the jury was entitled to believe. The evidence connecting Kaplan and Gorwitz with the conspiracy is more than sufficient.

### 4. *Cassidy.*

■ By reference to the briefs of the other appellants, Cassidy challenges the sufficiency of the evidence which convicted him of the conspiracy in this case.

At trial, the government produced evidence which showed that Cassidy was actively involved in the Eurovest operation. He made false representations concerning the enterprise and he sold insurance "binders" which purported to protect any fees advanced by the victims. These "binders" were an integral part of the scheme. Victims would not proffer advance fees without some form of protection. In fact, however, Cassidy's "binders" did not protect the fees, and Cassidy knew that his "binders" were worthless.

Cassidy does not contest most of these facts. Instead he argues that he did not have any intent to join and participate in the conspiracy. On the contrary, he says, he was acting solely in the role of an F.B.I. informer throughout his association with Eurovest.

The government produced witnesses who testified that Cassidy went beyond his informant role in making false representations to Eurovest victims. Also, the testimony showed that Cassidy did not inform the F.B.I. that he had made such representations.

The jury was entitled to believe that Cassidy actively participated in the Eurovest scheme and that he had the necessary intent to defraud. The jury was not required to believe that Cassidy was acting solely as a government informant, and it did not. Therefore, we affirm Cassidy's conviction on the conspiracy count.

### B. *Substantive Counts*

■ With one exception, the evidence was sufficient to support the convictions of

the appellants on all substantive counts charged. At least one of the appellants performed one or more of the illegal acts charged, and the acts charged were in furtherance of the conspiracy. All the appellants became guilty of the substantive acts by virtue of their participation in the conspiracy. *Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946).

The one exception is Count 22, which charges the appellants with mail fraud in connection with a letter sent from Arthur Lachman to Cassidy. We find that the evidence is insufficient to support a conviction on this count. The court should have granted the Rule 29 motion for acquittal on Count 22.

Lachman was a "money broker" who was negotiating with Eurovest on behalf of his clients. Lachman was concerned with obtaining insurance to protect any advance fees which were paid into the Dolwig account. In his negotiations with Eurovest, Lachman had occasion to speak with Cassidy in a conference call which included Kaplan. Cassidy made representations to Lachman concerning the extent of coverage that Cassidy's insurance company would provide.

Some time after this phone call, Lachman mailed the Count 22 letter to Cassidy. In it he asked for a confirmation of the oral representations Cassidy had made on the telephone. Cassidy sent no such confirmation.

■ The letter from Lachman to Cassidy could not form the basis of the mail fraud charged in Count 22 of the indictment, 18 U.S.C. § 1341. To violate § 1341, a defendant must be involved in a scheme to defraud, and he must cause a mailing for the purpose of executing that scheme. *Pereira v. United States,* 347 U.S. 1, 74 S.Ct. 358, 98 L.Ed. 435 (1954).

■ The evidence supports a finding that (a) there was a scheme to defraud, (b) Cassidy was involved, and (c) a mailing occurred. Furthermore, the evidence supports the conclusion that Cassidy caused the mails to be used in that it was reasonably foreseeable that Cassidy's oral representations to Lachman would result in the use of the mails to obtain a written confirmation. *See United States v. Maze,* 414 U.S. 395, 399, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974); *Pereira v. United States,* 347 U.S. at 8–9, 74 S.Ct. 358.

However, to affirm this conviction we must also find that this mailing was in furtherance of the scheme to defraud. Use of the mails that is not a step toward receipt of the fruits of the scheme is not a violation of § 1341. *United States v. Maze, supra; Kann v. United States,* 323 U.S. 88, 65 S.Ct. 148, 89 L.Ed. 88 (1944); *United States v. Staszcuk,* 502 F.2d 875 (7th Cir. 1974), *modified en banc on other grounds,* 517 F.2d 53, *cert. denied,* 423 U.S. 837, 96 S.Ct. 65, 46 L.Ed.2d 56 (1975); *Henderson v. United States,* 425 F.2d 134 (5th Cir. 1970).

Although the oral representations made by Cassidy were in furtherance of the Eurovest scheme, the letter from Lachman in response to those representations was not. Therefore, the convictions of those appellants who were convicted on Count 22 of the indictment are reversed.

## III. SEVERANCE FROM TRIAL OF CASSIDY

Appellants Kaplan, Gorwitz, Vogt, Stradley, and Dolwig insist that each should have had his trial severed from that of Cassidy. Each insists that his joinder with Cassidy prejudiced him sufficiently to require severance pursuant to Fed.R.Crim.P. 14.

■ To evaluate these contentions it is helpful to set forth certain principles. Motions to sever must be timely made and properly maintained, or the right to severance will be deemed waived. *United States v. Figueroa-Paz,* 468 F.2d 1055 (9th Cir. 1972). To preserve the point, the motion to sever must be renewed at the close of all evidence. 468 F.2d at 1057. This requirement is not an inflexible one; waiver may be absent when the motion accompanies the introduction of evidence deemed prejudicial and a renewal at the close of all evidence would constitute an unnecessary formality.

Diligent pursuit of a severance motion is the guiding principle. *United States v. Burnley*, 452 F.2d 1133 (9th Cir. 1971); *Williamson v. United States*, 310 F.2d 192 (9th Cir. 1962). Premature motions to sever not diligently pursued as the prejudicial evidence unfolds cannot serve as insurance against an adverse verdict.

On another occasion we have observed:

"The power vested in the district court pursuant to Rule 14 is discretionary, and the only question on appeal is whether such discretion has been abused. *Parker v. United States*, 404 F.2d 1193 (9th Cir. 1968), cert. denied, 394 U.S. 1004, 89 S.Ct. 1602, 22 L.Ed.2d 782 (1969). The test is whether a joint trial is so prejudicial to one defendant as to require the exercise of that discretion in only one way, that is, by ordering a separate trial." *United States v. Thomas*, 453 F.2d 141, 144 (9th Cir.), *cert. denied*, 405 U.S. 1069, 92 S.Ct. 1516, 31 L.Ed.2d 801 (1971).

*See United States v. Echeles*, 352 F.2d 892, 896 (7th Cir. 1965).

■ In determining whether the trial court abused its discretion, ordinarily we must view its denial of a motion to sever as of the time of denial. Only in rare cases will a trial court's failure to reopen, *sua sponte*, the question of severance constitute an abuse of discretion. *Byrd v. Wainwright*, 428 F.2d 1017, 1019 n.1 (5th Cir. 1970).

■ The trial court, in considering a motion to sever based upon a defendant's insistence that a codefendant will provide exculpatory testimony after severance, must weigh, *inter alia*, the good faith of the defendant's intent to have a codefendant testify, the possible weight and credibility of the predicted testimony, the probability that such testimony will materialize, the economy of a joint trial, and the possibility that the trial strategy of a codefendant (a decision to plead guilty, for example) will prejudice the defendant seeking severance. *Byrd v. Wainwright*, 428 F.2d at 1019–20. Our review of the trial court's exercise of its discretion must recognize the complexity and difficulty of this process of weighing.

■ Applying these principles to the denial by the trial court of the motions to sever by appellants Kaplan and Gorwitz presents little difficulty. In neither instance was the motion diligently pursued; hence any right to severance was waived. Both moved for a severance before trial, but such motions were not renewed when Cassidy indicated he would not testify and the existence of the FBI form 302 containing the allegedly exculpatory statements became known.

■ The circumstances are different with respect to Vogt, Stradley, and Dolwig. Each pursued diligently the motion to sever, renewing it during trial at the time Cassidy refused to testify, and when the existence of the FBI form became known. Although none of the three renewed the motion at the close of all evidence, the trial court had previously indicated that a renewal would be useless. Under these circumstances neither Vogt, Stradley, nor Dolwig waived his right to seek a severance.

■ Turning to appellants Vogt and Stradley initially, it is clear that each intended in good faith to attempt to induce Cassidy to testify. Also, by means of summaries by their counsel of the tenor of Cassidy's testimony which they expected, they sufficiently demonstrated the exculpatory character of Cassidy's expected testimony. Although an affidavit by Cassidy would have strengthened the credibility of this proposed testimony, we are not prepared to require such an affidavit under the circumstances of this case. *Cf. United States v. Shuford*, 454 F.2d 772 (4th Cir. 1971).

■ However, these summaries did not indicate a reasonable probability that Cassidy would give his exculpatory testimony. *Cf. United States v. Shuford, supra*. By contrast, the affidavits accompanying the motion to sever by defendant Enis did indicate a willingness on the part of Cassidy to testify on behalf of Enis. No such indication appears in the statements supporting the severance motions of Vogt and Strad-

ley. At best these summaries only demonstrated a "remote likelihood" that Cassidy's exculpatory testimony would become available. That is not enough. *See United States v. Thomas, supra.*

■ It is also true that Vogt obtained the benefit of Cassidy's opinion that Vogt was a "victim" of wrongdoing rather than a wrongdoer, through the cross-examination of Agents McKee and Bumpers. While the agents' testimony is not an adequate substitute for Cassidy's, it does strengthen our resolve not to characterize the trial court's refusal to sever as an abuse of discretion.

What has been said concerning appellants Vogt and Stradley is equally applicable to appellant Dolwig. The summary of the anticipated Cassidy testimony prepared by Dolwig's counsel reflected no reasonable probability that Cassidy would testify had Dolwig's trial been severed. Indeed, it would be unusual to expect such testimony. Moreover, the contents of this summary were read into evidence, thereby somewhat lessening any prejudicial effect of Cassidy's refusal to testify in the trial.

■ Dolwig also argues, relying on *United States v. Donaway,* 447 F.2d 940, 943 (9th Cir. 1971), that failure to sever him was an abuse of discretion because certain evidence put before the jury, while admissible with respect to other defendants, was not admissible against Dolwig. We believe the facts in *Donaway* far more clearly indicate an abuse of discretion than those present in this case. The fundamental issue is whether the jury can be expected to keep separate the evidence as it pertains to each jointly tried defendant. *Fernandez v. United States,* 329 F.2d 899, 906 (9th Cir. 1964). As *Fernandez* observes, the best indication of the jury's ability to compartmentalize is its failure to convict all defendants. 329 F.2d at 906. The failure to convict Enis provides such an indication here. Moreover, our view of the record convinces us that the jury was able to keep separate the evidence as it pertained to Dolwig.

■ Finally, Dolwig contends that he was unduly prejudiced by references during the trial to the Mafia and by Cassidy's entrapment defense. Both invoke the *Fernandez* inquiry, and both must be disposed of in the same manner as was Dolwig's complaint regarding evidence inadmissible as to him. We believe the jury could, and did, compartmentalize the evidence properly.

Obviously our refusal to hold that the trial court abused its discretion in refusing to sever Vogt, Stradley, and Dolwig from the trial of Cassidy is influenced by the truism that joint trials are usually less burdensome to the prosecution than separate trials. This economy does not entitle us to treat lightly, however, appeals based on refusals to order separate trials. Joint trials do alter the emotional and factual setting within which an individual's guilt or innocence is to be determined. Our task on review is to review carefully the record to determine whether the trial court abused its discretion in ordering a joint trial. We have made that review and hold that no such abuse exists in this case. *United States v. Wood,* 550 F.2d 435 (9th Cir. 1976).

## IV. THE INSTRUCTIONS

### 1. *Dolwig*

Dolwig contends that the trial court committed reversible error when it gave the government's proposed instructions relating to mail fraud (18 U.S.C. § 1341), transportation fraud (18 U.S.C. § 2314), and conspiracy to commit such offenses (18 U.S.C. § 371), on the ground that there was no evidence presented to support those charges. But we have indeed found evidence sufficient to support Dolwig's conviction on all substantive counts, with the exception of Count 22 charging mail fraud.[1] Furthermore, we have rejected his argument that the government failed to establish the requisite intent to support the con-

---

1. Dolwig was convicted on two counts (Counts 21, 22) of violating 18 U.S.C. § 1341. In part II(B) of this court's opinion, his conviction on

Count 22 is reversed. Dolwig was also convicted of four counts of transportation fraud and one count of conspiracy.

spiracy conviction. Thus, the instructions, except parts relating to Count 22, are clearly supported by the evidence.

Dolwig also asserts error in the refusal to give three requested instructions pertaining to his theory of defense. He relies on *Baker v. United States*, 310 F.2d 924, 930 (9th Cir. 1962), *cert. denied*, 372 U.S. 954, 83 S.Ct. 952, 9 L.Ed.2d 978 (1963). The three requested instructions[2] relate to Dolwig's purported role as an "escrow holder", innocent of all wrongdoing and himself a victim of the Eurovest scheme.

■ While it is clear that the trial judge must instruct the jury as to the defendant's theory of the case, the instructions given need not be in the precise language requested by the defendant. *Charron v. United States*, 412 F.2d 657, 660 (9th Cir. 1969); *Rivers v. United States*, 368 F.2d 362, 364 (9th Cir. 1966). The refusal to give a requested instruction is not error "if the charge as a whole adequately covers the theory of the defense." *United States v. Blane*, 375 F.2d 249, 252 (6th Cir. 1967), *cert. denied*, 389 U.S. 835, 88 S.Ct. 41, 19 L.Ed.2d 96 (1967), *reh'g denied*, 389 U.S. 998, 88 S.Ct. 459, 19 L.Ed.2d 503 (1967). Thus, the adequacy of the jury instructions is "not be determined by the giving, or failure to give, any one or more instructions," but by examining the instructions as a whole. *Beck v. United States*, 305 F.2d 595, 599 (10th Cir. 1962); *United States v.*

*Alvarez*, 469 F.2d 1065, 1067 (9th Cir. 1972); *United States v. Moore*, 522 F.2d 1068, 1079 (9th Cir. 1975), *cert. denied*, 423 U.S. 1049, 96 S.Ct. 775, 46 L.Ed.2d 637.

Viewed in their entirety, the instructions thoroughly elaborated on the terms "knowingly," "willfully," "specific intent," and "intent to defraud." While Dolwig's requested instructions were refused, the given instructions provided the jury with adequate guidance to consider evidence relating to the defense that he was an escrow holder, innocent of any wrongdoing.

Finally, Dolwig challenges Instruction 32, regarding knowing participation in a scheme to defraud, as being unfairly tailored to the facts of the case, and the refusal of the trial court to give an instruction on the requirement of actual knowledge as an essential element of each offense. The instructions, when viewed as a whole, adequately charged the jury on knowledge. Instruction 32 properly addressed the law applicable to the prosecution counts. Therefore, Dolwig's latter contentions must be rejected.

### 2. *Cassidy*

■ Appellant Cassidy contends that his conviction[3] must be reversed because of the trial court's refusal to give two requested jury instructions. Requested Instruction No. 3[4] relates to his claim that he lacked

---

**2.** Defendant Dolwig's Proposed Jury Instruction No. 1:

"In each instance in which the Defendant, RICHARD DOLWIG is charged, he purported to act as an escrow agent. If you find from all of the evidence that he believed that this was his role, that he did not mislead any third persons with reference to his role and that he had no knowledge that the role which he accepted was part of any scheme of any others to commit any offense charged, or if you have a reasonable doubt as to the above, then you must find Defendant, RICHARD DOLWIG not guilty as to all counts."

Defendant Dolwig's Proposed Jury Instruction No. 2.

"The mere fact standing alone that a particular defendant may have held a sum of money for a period of time is not sufficient upon which you may base a verdict of guilty. In order to return a guilty verdict, based on such a fact,

you must also find beyond a reasonable doubt that such person had an intent to defraud."

Defendant Dolwig's Proposed Jury Instruction No. 3.

"If you find that Defendant, RICHARD DOLWIG, believed that persons dealing in matters in which he was to be escrow agent would either receive letters of credit or have their money refunded, or if you entertain a reasonable doubt of such belief on his part, then you must find him innocent as to all counts in which he is charged."

**3.** Cassidy was convicted on one count (Count 16) of wire fraud, two counts (Counts 21, 22) of mail fraud, one count (Count 27) of racketeering, and one count (Count 28) of conspiracy. Count 22 was reversed as to all defendants.

**4.** "If you find the evidence in this case shows that defendant CASSIDY honestly and reasonably thought the actions and representations he

the requisite criminal intent because he was acting as a government informant. Requested Instruction No. 2[5] deals with the related claim that he acted in conformity with the agreement of nonprosecution he entered into with the Government. Cassidy further argues that the standard entrapment instruction[6] given by the trial court did not adequately present his defense of lack of *mens rea.*

Cassidy's contentions concerning the insufficiency of the instructions, like Dolwig's, must be rejected. During trial, Cassidy attempted to show that he "honestly and reasonably thought the actions and representations he was making to others were in the course of his activities as an informant." Through the testimony of FBI agents Bumpers and McKee, he tried to adduce evidence of entrapment from government encouragement of his activities and his own adherence to, and reliance upon, the agreement of nonprosecution with government prosecutors in Los Angeles. The entrapment instruction given by the court, when read *in pari materia* with the instructions on specific intent, willfulness, and knowledge, adequately presented the defense of lack of criminal intent. *See United States v. Elksnis,* 528 F.2d 236, 238 (9th Cir. 1975). The trial judge did not commit error in refusing to give the particular instructions Cassidy sought. *See Rivers v. United States, supra.*

■ Cassidy additionally challenges the complete "package" of instructions as being insufficiently tailored to the unique facts underlying his informant defense to enable the jury to assess his culpability separately from that of his codefendants. Although one identical specific-intent instruction was given as to all defendants, the trial court did instruct the jury that "each defendant is entitled to have his case determined from evidence as to his own acts and statements and conduct, * * * leaving out of consideration entirely any evidence admitted solely against some other defendant or defendants." Cassidy was not prejudiced by the absence of a separate specific-intent instruction applicable to him alone.

## V. PROSECUTORIAL MISCONDUCT

■ Cassidy contends that he should have been granted a mistrial because the government brought up, during the questioning of a federal agent, the point that Cassidy had first come to the attention of the FBI when that agency was asked to watch Cassidy board a plane for England so his attire could be described to Scotland Yard. This more or less harmless remark was shortly supplemented by the hearsay intelligence that Cassidy was of interest because of his possible role in the international transportation of stolen securities. While the prosecutor's inept control of the questioning at that point raises some questions about prosecutorial good faith, there was no basis for mistrial. At issue was whether Cassidy was an abused, faithful, confidential informer or a faithless double agent. Resolution of that issue requires that the story's beginning be told. This is what the prosecutor drew from the agent and what Cassidy's counsel previously had carefully avoided. Defense counsel correctly extracted only those portions of the story that tended to support his theory of the case. The prosecutor followed the same course from the point of view of the government. We detect no error.

---

was making to others were in the course of his activities as an informant or government agent you should acquit him on all counts."

**5.** "If you find the evidence in this case is that: 1) Defendant CASSIDY entered into an agreement with the government through its agents to cooperate with it by providing information in exchange for a promise of non-prosecution and 2) that defendant CASSIDY has substantially complied with his part of the agreement, then you must acquit DOUGLAS CASSIDY on all counts.

"Substantially complied with means that Defendant CASSIDY has provided the basic information and performed in a manner asked and that there is no omission of the essential requirements expected of him and that the information that was provided was satisfactory for the case under investigation."

**6.** 1 Devitt and Blackmar, Federal Jury Practice and Instructions § 13.13 (2d ed. 1970).

**970**

## VI. CASSIDY'S CHALLENGE TO THE INDICTMENT

 Appellant Cassidy argues for the first time on appeal that the prosecutor's failure to present exculpatory evidence of his status as a government informer to the grand jury requires a dismissal of the indictment against him.[7] A showing of fundamental error is necessary before we will consider issues not raised below. *United States v. Murray*, 492 F.2d 178 (9th Cir. 1973), *cert. denied sub nom., Roberts v. United States*, 419 U.S. 854, 95 S.Ct. 98, 42 L.Ed.2d 87 (1974). *See* Fed.R.Crim.P. 52(b).

No such error has been shown to exist. Appellant has not demonstrated that he was prejudiced by the challenged prosecutorial conduct. He has failed to show that his role as an informer actually exculpates him. As a consequence, his reliance on cases involving the use of perjured testimony relevant to a material element in an indictment is misplaced. *See United States v. Basurto*, 497 F.2d 781 (9th Cir. 1974). We can no more assume exculpation than we can materiality. Moreover, we recognize the wide discretion which the prosecution may exercise in grand jury proceedings. *United States v. Y. Hata & Co.*, 535 F.2d 508 (9th Cir. 1976).

Except for the convictions upon Count 22, which are in each instance reversed, and Stradley's conviction upon Count 27, all other convictions are affirmed.

Stradley was sentenced on Count 21 to two years, on Count 27, to five years, and on Count 28 to four years, all sentences to run concurrently. Stradley's conviction upon Count 27 is set aside upon the government's agreement, on a petition for rehearing, that it depended upon Count 22 and falls with the conviction upon Count 22.

Affirmed in part; reversed in part; remanded for entry of a modified sentence in No. 75–3428, *United States v. Walter Stradley*.

---

**7.** Motions to dismiss an indictment must be made before trial or they are waived. Fed.R. Crim.P. 12(b)(2), (f); *see, e. g., Mitchell v. United States*, 434 F.2d 230 (9th Cir. 1970), *cert. denied*, 402 U.S. 946, 91 S.Ct. 1636, 29 L.Ed.2d 115 (1971). The trial court may, however, defer determination of the motion, Fed.R.Crim.P. 12(e), or grant relief from the waiver for good

---

cause. Fed.R.Crim.P. 12(f). Cassidy failed to include this ground in his pretrial motion to dismiss the indictment; this failure alone is excusable because he did not receive a transcript of the relevant grand jury proceedings until midway through the trial. Nevertheless, he has no similar excuse for his failure to renew his motion during trial.